UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LARHONDA JONES, o/b/o D.J.,          )
                                     )
            Plaintiff,               )
                                     )
      v.                             )     Case No. 4:12CV1456 SNL
                                     )                        (FRB)
CAROLYN W. COLVIN, Acting            )
Commissioner of Social Security,[1]  )
                                     )
            Defendant.               )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

        This cause is before the Court on plaintiff's appeal of
an adverse determination by the Social Security Administration.
All pretrial matters were referred to the undersigned United States
Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate
disposition.

**I.  Procedural History**

        On March 26, 2010, the Social Security Administration
denied plaintiff Larhonda Jones' January 12, 2010, application for
Supplemental Security Income (SSI) filed on behalf of her son,
D.J., pursuant to Title XVI of the Social Security Act, 42 U.S.C.
§§ 1381, et seq., in which plaintiff claimed D.J. became disabled

---

        [1]On February 14, 2013, Carolyn W. Colvin became the Acting
Commissioner of Social Security.  Pursuant to Fed. R. Civ. P.
25(d), Carolyn W. Colvin should therefore be substituted for former
Commissioner Michael J. Astrue as defendant in this cause of
action.

on December 13, 2006. (Tr. 49, 64-68, 111-14.)[2] At plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ) on December 1, 2010, at which plaintiff and D.J. testified. (Tr. 30-45.) On December 22, 2010, the ALJ denied plaintiff's claim for benefits finding D.J.'s severe impairments of attention deficit hyperactivity disorder (ADHD) and chronic otitis media not to cause limitations which would render him disabled. (Tr. 8-24.) On June 19, 2012, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-5.) The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

Plaintiff now seeks judicial review of the Commissioner's final decision arguing that it is not supported by substantial evidence on the record as a whole. Specifically, plaintiff claims that the ALJ failed to identify or explain the weight given to the opinions of State agency reviewers and to the June 2009 opinion rendered by D.J.'s teacher, Ms. Hochstatter; and, further, that the ALJ improperly discredited the October 2010 Teacher Report completed by Mr. Bosch. Plaintiff also claims that the ALJ erred by failing to recognize that D.J. had been diagnosed with autism and Asperger's syndrome and thus failed to analyze these impairments in determining the extent of D.J.'s limitations in the

---

[2]Previous applications for SSI filed by plaintiff on behalf of D.J. were denied by the Social Security Administration and not pursued further. (See Tr. 46-63.) In the instant cause of action, plaintiff does not challenge these prior determinations.

broad domains of functioning. Plaintiff requests that the Commissioner's decision be reversed and that the matter be remanded for further proceedings.

## II. Evidence Before the ALJ

A. Testimony of D.J.

At the hearing on December 1, 2010, D.J. testified in response to questions posed by the ALJ.

At the time of the hearing, D.J. was nine years of age and in the fourth grade. D.J. testified that math was his favorite subject and that science was his least favorite subject. D.J. testified that he liked to play ball and wanted to be a football player when he grew up. D.J. testified that he was doing well in school and got along well with his teachers and other kids at school. D.J. testified that he had not gotten into any fights at school during the year, but that he fights with his sister over games. (Tr. 33-34.)

B. Testimony of Plaintiff

At the hearing, plaintiff testified in response to questions posed by the ALJ and counsel.

Plaintiff testified that D.J. was in special education classes at school and does not finish his schoolwork. Plaintiff testified that D.J. has problems doing homework at home because he does not like writing and gives up if it is too difficult. Plaintiff testified that D.J. has the most difficulty with his

reading class because of the writing involved, but that he has had no problems learning to read.  (Tr. 36-37, 39.)

Plaintiff testified that things were a little better at school for D.J. because of a new teacher, but that D.J. used to get involved in fights because of teasing from other kids, leading to suspensions.  Plaintiff testified that D.J. would get upset easily and would not stop kicking, screaming, and pushing when the teacher would tell him to stop.  Plaintiff testified that D.J. has been with his new teacher, Ms. Ford, for three weeks or a month. Plaintiff testified that, prior to Ms. Ford, Mr. Bosch was D.J.'s teacher from August to October.  (Tr. 36, 40-42.)

Plaintiff testified that D.J. does not get along well with his six-year-old sister and sometimes hits her.  Plaintiff testified that D.J. gets jealous and sometimes yells if she gives attention to his sister.  Plaintiff testified that D.J. throws a fit if he is unable to get what he wants and that it is difficult to calm him during such episodes.  Plaintiff testified that D.J. has no same-aged friends but has friends his sister's age. Plaintiff testified that D.J. tends to stay focused on television and video games and has no other real interests.  (Tr. 36-37, 39-41.)

Plaintiff testified that she must constantly remind D.J. to brush his teeth, get dressed, and take a bath and sometimes must engage in these activities with him in order for him to do them.

Plaintiff testified that D.J. has difficulty staying asleep, and that he watches television when he cannot go back to sleep in the middle of the night. (Tr. 37-38.)

Plaintiff testified that D.J. has been taking Adderall since 2006 and that she gives it to him in the morning as prescribed. Plaintiff reported that D.J. has shown improvement while taking the medication. (Tr. 43-44.)

Plaintiff testified that D.J. also has had many ear infections and currently has tubes in his ears. Plaintiff testified that D.J.'s speech problems have improved. (Tr. 42-43.)

### III. Medical, School and Counselor Records

D.J. visited Grace Hill Neighborhood Health Center (Grace Hill) on March 21, 2006, for his annual physical exam. D.J. was five years of age. Plaintiff reported that D.J. was having sleep disturbances at night with yelling and screaming. Plaintiff also reported that D.J. could not sit still at school. Physical examination showed tubes to be in both ears. D.J.'s speech could be understood. D.J. was diagnosed with ADHD and night terrors. (Tr. 251-52.)

On June 8, 2007, D.J. underwent a consultative psychological evaluation for disability determinations. D.J. was six years of age, and D.J.'s father reported that D.J. had behavior problems and lead poisoning. D.J. reported that things were good at school although he admitted to some fighting with peers which

resulted in suspension and detention.  D.J. also reported being in trouble at home a lot.  D.J.'s father reported that D.J. engaged in yelling, screaming, crying, and had difficulty paying attention at school if he did not take his medication.  D.J.'s father reported D.J. to have been taking Adderall[3] for six months, that such medication helped considerably, but that D.J. had run out of the medication two days prior.  It was noted that D.J. was going to be in first grade and was not receiving special education services. Mental status examination showed D.J. to have a generally cooperative and pleasant attitude, with good eye contact and an alert affect.  D.J. was noted to be slightly fidgety, but fine and gross motor activity was noted to be within normal limits.  No problems were noted with D.J.'s speech or with his receptive and expressive language ability.  Dr. L. Lynn Mades opined that D.J. was within the low average range of intelligence.  Summary of D.J.'s level of daily functioning was unremarkable.  Upon conclusion of the evaluation, Dr. Mades diagnosed D.J. with ADHD, combined type, and assigned a Global Assessment of Functioning (GAF) score of 75-80.[4]  Dr. Mades opined that D.J.'s behavior

---

[3]Adderall is used to control symptoms of ADHD.  Medline Plus (last revised Aug. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601234.html>.

[4]A GAF (Global Assessment of Functioning) score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).  A GAF score of 71-80 indicates that, if symptoms are present, they are transient and expectable reactions to

problems may mildly affect his school activity but that D.J.'s prognosis was good. Dr. Mades opined that D.J.'s ability to relate to others, including peers and teachers, was intact to mildly impaired at times. (Tr. 257-61.)

In a Childhood Disability Evaluation Form completed June 21, 2007, Dr. Judith McGee, a medical consultant with disability determinations, opined that D.J.'s ADHD resulted in less than marked limitations in the domains of Attending and Completing Tasks, and Interacting and Relating with Others; and no limitations in the domains of Acquiring and Using Information, Moving About and Manipulating Objects, Caring for Yourself, and Health and Physical Well-Being. (Tr. 262-67.)

On August 23, 2007, D.J. visited Dr. Robert W. Edmonds at Grace Hill who noted D.J. to be taking Adderall. Plaintiff reported that D.J. needed the medication. Dr. Edmonds noted D.J. to be a bit hyper in the waiting room but that he was behaved and focused in the examination room. D.J.'s prescription for Adderall was refilled and follow up examinations were scheduled. (Tr. 283.)

D.J. returned to Dr. Edmonds on September 26, 2007, who noted D.J. to be focused and pleasantly conversational during the examination. It was noted that D.J. was doing well both at school and at home while taking Adderall. Instruction was given to

psychosocial stressors (e.g., difficulty concentrating after family argument) causing no more than a slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in school work).

continue with Adderall and to undergo counseling with Dr. West. (Tr. 284.)

Discipline records from Confluence Academy show that D.J. was suspended from school on September 26, 2007, because of disorderly conduct. (Tr. 274.)

On October 30, 2007, Dr. Edmonds noted D.J. to be doing well on Adderall both at school and at home, and that there were no concerns. D.J. was noted to be pleasant, focused, and conversational during the exam. Instruction was given to continue with Adderall and for follow up examination and counseling. (Tr. 285.)

During an examination on December 18, 2007, Dr. Edmonds noted that D.J. continued to do well on Adderall. D.J. was focused and conversational during the exam. (Tr. 286.)

On February 7, 2008, D.J. received a warning at school because of violence with students. (Tr. 274.) It was reported that D.J. became suddenly upset in class, threw his pencil box, began throwing crayons on the floor, and pushed two other students. (Tr. 272.)

On February 12, 2008, D.J. was suspended from school because of violence with students. (Tr. 274.) It was reported that D.J. continued to take others' things and run around the room; ran away from the teacher; kicked tables, chairs, and other students; and hit a boy in the stomach. (Tr. 273.)

D.J. visited Grace Hill on April 29, 2008, for his annual physical examination. It was noted that D.J. was taking Adderall for ADHD and was doing well in school and having no problems. Instruction was given to continue with current medication. (Tr. 287-88.)

In a Childhood Disability Evaluation Form completed August 7, 2008, Kyle DeVore, a medical consultant with disability determinations, opined that D.J.'s ADHD resulted in less than marked limitations in the domains of Attending and Completing Tasks, and Interacting and Relating with Others; and no limitations in the domains of Acquiring and Using Information, Moving About and Manipulating Objects, Caring for Yourself, and Health and Physical Well-Being. (Tr. 295-300.)

In August and September 2008, plaintiff reported to Grace Hill that D.J. was doing well on Adderall. (Tr. 437-40.)

D.J. visited Dr. Monica Ultmann at Grace Hill on November 4, 2008, who noted D.J.'s last visit with Dr. Edmonds to have been in December 2007. It was noted that D.J. had done well on Adderall but that plaintiff felt that D.J. was becoming more active, inattentive, impulsive, and intrusive. It was noted that D.J. was in the second grade and had been suspended four times during the current school year due to fighting. Dr. Ultmann characterized D.J. as a young boy with ADHD, oppositional behavior, and learning concerns. D.J.'s dosage of Adderall was increased and a referral

was made for a school-based evaluation.  (Tr. 426.)

D.J. returned to Dr. Ultmann on December 16, 2008. Plaintiff reported that D.J. did well on the increased dosage of Adderall, but that he had since run out of medication resulting in a significant difference in behavior.  D.J.'s dosage of Adderall was increased.  (Tr. 427.)

D.J. visited Dr. Sharon West at Grace Hill on December 16, 2008, who noted D.J. to be struggling significantly at school. Plaintiff reported that D.J.'s teacher was not a "good match" for D.J. and that the teacher called home daily regarding D.J.'s behavior.  Dr. West noted D.J.'s speech to be significantly delayed and that Dr. Ultmann referred D.J. for speech evaluation.  Clinical impressions suggested expressive language delay and general development delays.  Dr. West focused on social skills building. (Tr. 430.)

D.J. visited Grace Hill on January 21, 2009, and complained of having ear aches.  It was noted that D.J. was doing well on Adderall.  Examination showed D.J. to have otitis and medication was prescribed.  (Tr. 499.)

On February 17, 2009, plaintiff reported to Dr. Ultmann that D.J.'s focus, attention, and activity level had significantly improved with the increased dosage of Adderall, and that she was very satisfied.  D.J. was continued on the current dosage of Adderall and was scheduled for follow up in three months.  (Tr.

428.)

On March 30, 2009, D.J.'s second grade teacher, Benetta Hochstatter, completed an NICHQ Vanderbilt Assessment Scale in which she reported that D.J., while on medication, very often engaged in the following behaviors:  avoids, dislikes, or is reluctant to engage in tasks that require sustained mental effort; loses things necessary for tasks or activities; leaves his seat in the classroom or in other situations in which remaining seated is expected; loses his temper; actively defies or refuses to comply with adult's requests or rules; is angry or resentful; is spiteful and vindictive; bullies, threatens, or intimidates others; initiates physical fights; is physically cruel to people; deliberately destroys others' property; and is afraid to try new things for fear of making mistakes.  Ms. Hochstatter further reported that D.J. often engaged in the following behaviors:  fails to give attention to details or makes careless mistakes in schoolwork; has difficulty sustaining attention to tasks or activities; does not seem to listen when spoken to directly; is easily distracted by external stimuli; fidgets with hands or feet or squirms in seat; runs about or climbs excessively in situations in which remaining in seat is expected; is "on the go" or often acts is if "driven by a motor"; has difficulty waiting in line; interrupts or intrudes on others; lies to obtain goods for favors or to avoid obligations; and is fearful, anxious, or worried.  Ms.

Hochstatter also reported that D.J. had somewhat of a problem in reading and organizational skills, and was problematic in his relationship with peers, following directions, disrupting class, and completing assignments. Ms. Hochstatter reported that D.J. had average performance in math and written expression. (Tr. 562-63.)

D.J. visited Dr. West on April 28, 2009, and reported doing well in school. Plaintiff expressed concern regarding the results of the teacher-completed Social Responsiveness Scales (SRS) which contained scores suggestive of autism. Dr. West advised plaintiff that a diagnosis of autism is based on more than a single indicator and that such a diagnosis had not yet been given. Dr. West focused on social skills building with D.J. (Tr. 431.)

D.J. returned to Dr. West on May 12, 2009, who noted D.J. to have very poor eye contact, to engage in significant tongue thrushing, and to appear awkward and uncomfortable. Social skills building was emphasized. (Tr. 432.)

D.J. visited Dr. Ultmann on May 12, 2009. Plaintiff reported improvement in D.J.'s focus, attention, and activity level but reported that Adderall's effect may not be achieved until three or four hours after D.J.'s taking of the medication, resulting in difficulties at school during the morning. Dr. Ultmann expressed concern regarding completed SRS and Vanderbilt teacher scales and D.J.'s history of some delays in language, eye contact, and social interaction. "It may be that [D.J.] has a mild PDD-NOS impacting

his overall development."[5]   (Tr. 429.)   An increased dosage of Adderall was prescribed, and applications for Regional, Judevine, and SSI were completed.  It was also noted that the school would be contacted with feedback on Dr. Ultmann's concerns.  (Tr. 429.)

D.J. underwent a physical examination at Grace Hill on May 12, 2009, during which D.J.'s treatment for ADHD was noted.  It was also noted that D.J. failed the hearing test for the left ear. Instruction was given for D.J. to continue with his current medications and to keep his appointments with Dr. Ultmann.  (Tr. 433-34.)

An initial Individualized Education Program (IEP) meeting was held June 12, 2009, during which D.J.'s diagnosis of "Other Health Impaired due to ADHD" was noted.  D.J. was in the second grade.  D.J. was reported to have difficulty remaining in his seat, and to have difficulty beginning and completing classroom assignments.  It was also noted that D.J. often failed to pay close attention to details, made careless mistakes, often did not attend to classroom instruction, and needed frequent reminders to focus. It was noted that D.J. was currently taking Adderall which helped

_____

[5]PDD-NOS (Pervasive Developmental Disorder not otherwise specified) is a type of autism spectrum disorder and may be diagnosed in people who meet some of the criteria for autistic disorder or Asperger syndrome, but not all.  They may have only social and communication challenges.  *What Are Autism Spectrum Disorders (ASD)?*, <u>NIH MedlinePlus - The Magazine</u>, Winter 2013, vol. 7, no. 4, pp. 18-19, *available at* <<u>http://www.nlm.nih.gov/</u> medlineplus/magazine/issues/winter13/articles/winter13pg18-19.htm l>.

to manage many of the symptoms of ADHD.  Recent evaluations showed D.J. to be in the average range of cognitive functioning, with a nonverbal IQ score of 105.  D.J. was determined to have the ability to achieve in the average range compared to his same-aged peers. D.J. did not qualify for language therapy.  D.J.'s gross and fine motor abilities were appropriate for classroom functioning.  The Differential Test of Conduct and Emotional Problems showed D.J. to be in the normal range for emotional problems and in the mid-range for conduct problems.  It was determined that D.J. would receive special education services for a total of 270 minutes per week in social skills instruction, task-related behavior, and math reasoning.  It was determined that D.J. would participate in regular physical education, and be placed in the regular classroom at least eighty percent of the time with accommodations including extended time, preferential seating, and positive reinforcement. It was determined that accommodations provided to D.J. during standardized testing would include individual testing and paper copies of benchmarks.  (Tr. 323-65.)

D.J. visited the Washington University Department of Otolaryngology on June 16, 2009, for follow up of his recent removal of the tube in his right ear in relation to his recurrent otitis media.  It was noted that plaintiff was pleased with D.J.'s speech and language development.  D.J. was noted to be doing well. D.J.'s speech was noted to be appropriate for his age, and there

were no hearing concerns. Results of an audiogram were within normal limits for both ears. D.J. was instructed to follow up as needed. (Tr. 494-95.)

On June 30, 2009, Ms. Hochstatter completed a Teacher Questionnaire for disability determinations. Ms. Hochstatter reported that she had known D.J. for two years and had seen him over eight hours a day, five days a week, for instruction in reading, writing, math, science, and social science. Ms. Hochstatter reported that D.J. was presently in the second grade and performed at the second grade level in reading, math, and written language. In the domain of Acquiring and Using Information, Ms. Hochstatter opined that D.J. had no problems and that D.J. functioned at an age-appropriate level. In the domain of Attending and Completing Tasks, Ms. Hochstatter opined that D.J. had serious problems on a daily basis in the areas of completing classwork/homework assignments and completing work accurately without careless mistakes. Ms. Hochstatter opined that D.J. had obvious problems on a daily or monthly basis in the areas of paying attention when spoken to directly, focusing long enough to finish assigned activity or task, refocusing to task when necessary, carrying out multi-step instructions, waiting to take turns, working without distracting self or others, and working at a reasonable pace/finishing on time. In the domain of Interacting and Relating with Others, Ms. Hochstatter opined that D.J. had a

very serious problem on a monthly basis in the area of expressing anger appropriately. Ms. Hochstatter further opined that D.J. had obvious problems on a weekly or monthly basis in the areas of making and keeping friends, seeking attention appropriately, and respecting/obeying adults in authority. In nine other areas of the domain, Ms. Hochstatter opined that D.J. had no or only slight problems. Ms. Hochstatter reported that she could understand almost all of D.J.'s speech. In the domain of Moving About and Manipulating Objects, Ms. Hochstatter opined that D.J. had a slight problem using fine motor skills for cutting, but otherwise had no problems in the domain. Finally, Ms. Hochstatter opined that D.J. had no problems in the domain of Caring for Himself. Ms. Hochstatter reported that D.J. took prescribed medication on a regular basis and that his functioning changed after taking such medication. (Tr. 312-19.)

In a Childhood Disability Evaluation Form completed July 10, 2009, Dr. DeVore opined that D.J.'s ADHD resulted in less than marked limitations in the domains of Attending and Completing Tasks, and Interacting and Relating with Others; and no limitations in the domains of Acquiring and Using Information, Moving About and Manipulating Objects, Caring for Yourself, and Health and Physical Well-Being. (Tr. 303-07.)

On August 18, 2009, D.J. underwent an Initial Behavioral Assessment at TouchPoint Autism Services (formerly Judevine Center)

for the purpose of determining areas of strength and deficit in his social/emotional and communication skills. (Tr. 478-88.) Scores from the Childhood Autism Rating Scale (CARS), completed by plaintiff, placed D.J. within the mildly-moderately autistic range. Results of the Asperger Syndrome Diagnostic Scale (ASDS), completed by plaintiff, placed D.J. within the likely range of possibility for Asperger's syndrome. In addition to receiving information from plaintiff, speech-language pathologist Lisa McNiff, M.S., CCC/SLP,[6] independently observed and evaluated D.J. using the Autism Diagnostic Observation Schedule – Module 3 (ADOS), a standardized instrument used to observe the participant's spontaneous social-communicative behavior, assess the participant's ability to behave appropriately when given various demands in particular situations, and to provide a standard context for the collection of a language sample. Ms. McNiff reported that, according to the scores obtained on the ADOS, D.J. fell within the autism range. Upon conclusion of the evaluation, Ms. McNiff reported that D.J. was pleasant and cooperative throughout the assessment, but exhibited deficits in his reciprocal social interaction and communication skills with some difficulty with his activity level. Ms. McNiff opined that such deficits impact D.J.'s ability to develop and maintain social

---

[6]Certificate of Clinical Competence in Speech-Language Pathology (CCC-SLP). American Speech-Language-Hearing Ass'n, *General Information About ASHA Certification*, http://www.asha.org/Certification/AboutCertificationGenInfo.htm (last visited May 21, 2013).

relationships with his peers and may also impact his academic success. Ms. McNiff concluded that

> [D.J.]'s scores on the ADOS-Module 3, CARS and ASDS are consistent with a diagnosis of autism. He presents with social difficulties and decreased coping strategies, which are also indicative of autism. [D.J.] also performs better with visual cues and modeling over auditory, which is another characteristic of children with autism spectrum disorder.

(Tr. 485.)

Based on this Assessment, Ms. McNiff reported that D.J. had several characteristics of autism spectrum disorder resulting in deficits in communication skills and in his understanding of social relationships and behavioral issues. Ms. McNiff requested that D.J. participate in communication therapy and behavioral therapy. (Tr. 465-68.)

D.J. visited Dr. Shulamit Portnoy at Grace Hill on September 23, 2009, for follow up of his behavioral problems. D.J. was in the third grade. Dr. Portnoy noted the severity of the problems to be mild and that D.J. was improving. Plaintiff reported that D.J. was doing great, and there were no complaints from school. Dr. Portnoy noted the symptoms of D.J.'s condition to be relieved by medication. Dr. Portnoy noted teacher and parent reports dated March 2009 to show concerns relating to inattention/ distractibility, hyperactivity/impulsivity, social cognition, communication, and autistic mannerisms. Dr. Portnoy also noted

recent assessments to contraindicate an emotional disturbance inasmuch as D.J. was measured to be in the normal range; that D.J. was assessed to be in the mid-range for conduct problems; and that D.J. demonstrated behavior consistent with or better than that of his peers. D.J. was continued in his diagnosis of ADHD and was instructed to continue with Adderall. (Tr. 535-38.)

On November 12, 2009, D.J. underwent a Sensory Integration Observational Assessment at TouchPoint Autism Services for the purpose of identifying sensory needs and possible intervention strategies. Julie Grana, MA, OTR/L, BCBA, noted D.J. to have a primary diagnosis of ADHD with a secondary diagnosis of an unspecified PDD-active. It was noted that D.J. was in the third grade. Ms. Grana noted D.J. to comply with most directives, but to "clown" when his mother and grandmother were in the room. It was noted that once they left the room, D.J. completed all activities without interfering behavior. The Assessment showed D.J. to demonstrate normal to over-reactive reactions to tactile input, to seek vestibular input, to demonstrate difficulty processing proprioceptive input, to have difficulty with auditory attention, to have difficulty performing tasks that relied on visual motor and visual perceptual skills, and to demonstrate deficits with fine motor activities. Strategies were identified to help D.J. in each of these areas. (Tr. 471-77.)

Plaintiff visited Grace Hill on December 9, 2009, to

speak with a social worker regarding her concerns that D.J.'s IEP was not being followed. Plaintiff reported that D.J. had recently been suspended and was not allowed to return to school until January 5, 2010. Plaintiff received assistance in writing a letter to the school requesting that an IEP meeting be held. (Tr. 505.)

On December 24, 2009, Dr. Portnoy referred D.J. to TouchPoint Autism Services for follow up and treatment of D.J.'s diagnosed chronic condition of unspecified PDD, current or active state. (Tr. 489.)

D.J. returned to Dr. Portnoy on January 25, 2010, with complaints of symptoms of ADHD and autism spectrum disorder. With respect to ADHD, plaintiff reported that D.J. had improved behavior and academic performance with no complaints from teachers. It was noted that D.J. had transferred schools in December and had already made new friends. With respect to autism spectrum disorder, it was noted that D.J. was receiving ninety minutes of communication therapy each week at TouchPoint. Dr. Portnoy diagnosed D.J. with chronic ADHD and instructed D.J. to continue with Adderall as prescribed. Dr. Portnoy also diagnosed D.J. with chronic unspecified PDD, current. Dr. Portnoy instructed plaintiff to pursue IEP accommodations with respect to both conditions. (Tr. 541-44.)

D.J. visited Health Care for Kids on February 17, 2010, and complained of having sore ears. D.J. was diagnosed with acute

otitis media and medication was prescribed. (Tr. 534.)

D.J. visited Grace Hill on March 15, 2010, for his annual physical examination. D.J.'s chronic problems were noted to be ADHD with hyperactivity and unspecified PDD, current. It was noted that D.J. was currently being treated by Dr. Portnoy for ADHD and autism. It was noted that plaintiff cooperated with family, friends, and teachers, and there were no concerns regarding D.J.'s relationships with others. Physical examination showed mild effusion in both ears with moderate scarring of the left tympanic membrane. Audiometry showed hearing loss in the left ear. Otherwise, physical examination was unremarkable. D.J. was diagnosed with ADHD. D.J. was also diagnosed with serous otitis, and plaintiff was instructed to follow up on the condition. (Tr. 545-47.)

On March 25, 2010, Aine Kresheck with disability determinations completed a Childhood Disability Evaluation Form in which he opined that D.J. had no limitations in the domains of Acquiring and Using Information, Moving About and Manipulating Objects, Caring for Himself, and Health and Physical Well-Being. Mr. Kresheck opined that D.J. had marked limitations in the domain of Interacting and Relating with Others, and less than marked limitations in the domain of Attending and Completing Tasks. (Tr. 511-15.)

During an IEP review meeting held March 31, 2010, D.J.'s

diagnosis of "Other Health Impaired due to ADHD" was noted. D.J. was in the third grade. D.J. was reported to have difficulty staying on task without assistance and to sometimes be off focus. It was noted that disruptive behaviors previously exhibited by D.J. were no longer observed by his teachers. It was noted that D.J. was currently taking Adderall which helped to manage many of the symptoms of ADHD. It was also noted that D.J. performed below his same-aged peers in Reading Comprehension and Written Expression, and that he struggled with Math Reasoning and in some areas of Math Computations. D.J. was currently receiving a 'D' in Reading, indicating a concern in his reading ability. It was determined that D.J. would receive special education services for a total of 350 minutes per week in task-related behavior, reading, math, and written expression. It was determined that D.J. would participate in regular physical education, and be placed in the general education environment forty to seventy-nine percent of the time with accommodations including extended time, preferential seating, lower difficulty assignments, frequent reminder of rules, checking for understanding, and positive reinforcement. It was determined that accommodations provided to D.J. during standardized testing would include extended time and small group settings. (Tr. 211-27.)

D.J. returned to Grace Hill on May 28, 2010, with complaints of ear pain. Upon examination, D.J. was diagnosed with

otitis media, serous, chronic; and otitis media, suppurative (perforation of the eardrum). Medication was prescribed. (Tr. 548-49.)

D.J. visited the Washington University Department of Otolaryngology on June 15, 2010, and plaintiff reported D.J.'s hearing to have worsened. Plaintiff reported D.J. to have trouble at school and she expressed concern regarding auditory processing. Physical examination showed thick fluid about the middle ear, bilaterally. Audiogram showed mild to moderate conductive hearing loss in the left ear and borderline normal dropping to mild moderate hearing loss in the right ear. D.J. was diagnosed with chronic otitis media with effusion and conductive hearing loss. It was determined that D.J. would undergo placement of bilateral ear tubes. (Tr. 522-24.)

D.J. visited Grace Hill on June 18, 2010, for follow up of serous otitis and ADHD. It was noted that D.J. was undergoing surgery for otitis in August, and that he was doing well on Concerta[7] for ADHD under the care of Dr. Portnoy. D.J.'s August 2009 assessments for autism and Asperger's syndrome were noted, indicating scores within the autistic range. A report from an occupational therapy evaluation indicating sensory integration dysfunction was also noted. D.J. was continued in his diagnoses of

---

[7]Concerta is used to control symptoms of ADHD. Medline Plus (last revised Nov. 20, 2012)<http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a682188.html>.

chronic, serous otitis media and ADHD and was instructed to continue treatment with Dr. Portnoy. (Tr. 550-51.) Follow up examination on August 13, 2010, showed D.J. to have recently undergone ear surgery and that he was doing well on Concerta. (Tr. 552-53.)

D.J. returned to Dr. Portnoy on September 1, 2010, who noted there to be no new concerns with no updated reports from school. D.J. was in the fourth grade. Plaintiff reported that D.J. had not received services from TouchPoint since June 2010 because of conflicts with her work schedule, but that D.J. had shown much improvement in that he engaged easier with his peers and interacted appropriately with family members, adults, and same-aged peers. Plaintiff reported that D.J. continued to have difficulties communicating ideas verbally and had not yet made friends at school. Physical examination was unremarkable. Dr. Portnoy noted the August 2009 evaluation results from TouchPoint to place D.J. within the autistic range. Dr. Portnoy also noted a report from occupational therapy indicating sensory integration dysfunction. Dr. Portnoy continued to diagnose D.J. with ADHD, chronic, and instructed D.J. to continue with Adderall. Dr. Portnoy also diagnosed D.J. with unspecified PDD, residual state. Plaintiff was instructed to provide D.J.'s teacher with a Vanderbilt questionnaire and to return it to Dr. Portnoy. D.J. was instructed to return for follow up in six months. (Tr. 554-57.)

Between August 24, 2010, and September 27, 2010, D.J. received out-of-school suspensions totaling five days because of fighting.  (Tr. 241.)

On October 7, 2010, David Bosch completed a Child Functioning Questionnaire in which he rated D.J.'s behaviors and abilities in six broad areas of functioning.  In the area of Acquiring and Using Information, Mr. Bosch opined that D.J. was markedly limited in his ability to understand and follow verbal instructions, remember verbal instructions, and generally follow instructions.  Mr. Bosch further opined that D.J. was moderately limited in his ability to learn new material, recall previously learned material, demonstrate short-term recall, demonstrate problem solving skills, and recognize and use concepts.  Mr. Bosch opined that D.J. had no limitations in his ability to use appropriate vocabulary, recognize colors and shapes, count and spell, and use imagination in play and creative activities.  Mr. Bosch summarized that D.J. "can acquire information and is actually extremely intelligent, but he has trouble listening and acquiring information in a large group setting." (Tr. 232.)  In the area of Interacting and Relating, Mr. Bosch opined that D.J. had extreme limitations in his ability to get along with other children, sharing and taking turns, initiating interactions, controlling unprovoked hostility or anger, controlling aggression, and showing initiative in conversation.  Mr. Bosch further opined that D.J. had

marked limitations in his ability to get along with authority figures, respect and/or be obedient to authority, interact appropriately with adults, and be understood by others. Mr. Bosch opined that D.J. had no limitations regarding disruptions or constant talking. Mr. Bosch summarized that D.J. most often refused to talk to or interact with him except in a very personal, one-on-one situation; that D.J. loses his temper daily and becomes angry and hostile; and that D.J. shuts down and refuses to take part in class and individual activities. (Tr. 233.) In the area of Attending and Completing Tasks, Mr. Bosch opined that D.J. had extreme limitations in his ability to filter out distractions and to remain focused on task at a consistent level of performance, to return to a task after interruptions without reminders to finish, to attend to a speaker when spoken to directly, and to tolerate frustration. Mr. Bosch further opined that D.J. had moderate limitations in his ability to initiate and complete most activities, change activities without needing re-direction from adults, maintain focus during group activity, take turns and change activity when appropriate, concentrate on activities, avoid easy distractions, follow through on instructions, concentrate without adult supervision, carry out simple instructions, avoid daydreaming, pay attention, and stay on task without being reminded. Finally, Mr. Bosch opined that D.J. had no limitations in his ability to begin, carry through, and finish most enjoyable

activities; persevere and keep pace with peers; control the impulse to blurt out answers; keep track of possessions; complete tasks on time; and perform tasks without bothering others. Mr. Bosch summarized that D.J. is able to do a great job, but that it is hard for him to regain attention once distracted. (Tr. 234.) In the area of Moving About and Manipulating Objects, Mr. Bosch opined that D.J. was moderately limited in his ability to exhibit eye-hand coordination and explore actively in a wide area of the physical environment using his body with control and independence from others. Otherwise, Mr. Bosch opined that D.J. had no limitations in this area. (Tr. 235.) In the area of Caring for Self, Mr. Bosch opined that D.J. was extremely limited in his ability to enjoy or fully participate in group activities, spontaneously pursue enjoyable activities or interests, and laugh freely. Mr. Bosch further opined that D.J. had marked limitations in his ability to willingly be consoled when sad and to demonstrate emotion. Mr. Bosch opined that D.J. had moderate limitations in his ability to organize himself and his belongings for class, to follow through on reaching goals, to cope with periods of unprovoked fear or anxiety, and to exhibit stereotyped mannerisms. Mr. Bosch opined that D.J. otherwise had no limitations in this area, such as with proper hygiene and personal care, maintaining his own space and personal property, and controlling behavior that is dangerous or unsafe. (Tr. 236.) Finally, in the area of Health

and Physical Well-Being, Mr. Bosch opined that D.J. had no limitations. (Tr. 237.)

D.J.'s school progress report for the first period of fourth grade, dated November 20, 2010, shows D.J. to have received a grade of 'N' in the subjects of Work, Study, and Social Skills; Language; Reading; and Math. For purposes of the progress report, 'N' denoted "skill not yet developed." D.J. received a grade of Satisfactory in Music and Art, and a 'B' in Physical Education. (Tr. 239-40.)

### IV.  The ALJ's Decision

The ALJ found D.J. to be a school-aged child and not to have engaged in substantial gainful activity at any time relevant to the decision.  The ALJ found D.J.'s impairments of ADHD and chronic otitis media to be severe.  The ALJ found, however, that D.J. did not have an impairment or combination of impairments that met or medically equaled the severity of Listing 102.10 (Hearing Loss) or Listing 112.11 (ADHD).  The ALJ also found that D.J. did not have an impairment or combination of impairments that functionally equaled the Listings.  The ALJ thus determined D.J. not to have been disabled at any time since the filing of the application, that is, since January 5, 2010.  (Tr. 11-24.)

### V.  Discussion

A claimant under the age of eighteen is considered disabled and eligible for SSI under the Social Security Act if he

"has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). With respect to determining the disability of a child-claimant, "the Commissioner of Social Security shall make reasonable efforts to ensure that a qualified pediatrician or other individual who specializes in a field of medicine appropriate to the disability of the individual (as determined by the Commissioner of Social Security) evaluates the case of such individual." 42 U.S.C. § 1382c(a)(3)(I).

The Commissioner is required to undergo a three-step sequential evaluation process when determining whether a child is entitled to SSI benefits. First, the Commissioner must determine whether the child is engaged in substantial gainful activity. If not, the Commissioner must then determine whether the child's impairment, or combination of impairments, is severe. Finally, if the child's impairment(s) is severe, the Commissioner must determine whether such impairment(s) meets, medically equals or functionally equals the severity of an impairment listed in Appendix 1 of Subpart P of Part 404 of the Regulations. 20 C.F.R. § 416.924(a); Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647 (8th Cir. 2004). If the impairment(s) meets or medically equals a Listing, the child is disabled. Garrett, 366 F.3d at 647. If a

child's impairment does not meet or medically equal a listed impairment, the Commissioner will assess all functional limitations caused by the child's impairment to determine whether the impairment functionally equals the Listings. 20 C.F.R. § 416.926a. To functionally equal a listed impairment, the child's condition must result in an "extreme" limitation of functioning in one broad area of functioning, or "marked" limitations of functioning in two broad areas of functioning. 20 C.F.R. § 416.926a(a). The domains are "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The six domains used by the Commissioner in making such a determination are: 1) Acquiring and Using Information; 2) Attending and Completing Tasks; 3) Interacting and Relating with Others; 4) Moving About and Manipulating Objects; 5) Caring for Oneself; and 6) Health and Physical Well-Being. Id. If this analysis shows the child not to have an impairment which is functionally equal in severity to a listed impairment, the ALJ must find the child not disabled. Oberts o/b/o Oberts v. Halter, 134 F. Supp. 2d 1074, 1082 (E.D. Mo. 2001).[8]

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. §

---

[8]The ALJ here determined that D.J. suffered marked limitations in one domain of functioning, and less than marked or no significant limitations in all other domains. Plaintiff makes no specific challenges to the ALJ's findings in the various domains of functioning.

405(g); <u>Young v. Shalala</u>, 52 F.3d 200 (8th Cir. 1995) (citing <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993)). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998). In evaluating the substantiality of the evidence, the Court must consider evidence which supports the Commissioner's decision as well as any evidence which fairly detracts from the decision. <u>Id.</u> Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. <u>Id.</u>

In this cause, plaintiff claims that the ALJ erred in his adverse determination by failing to consider D.J.'s diagnosed condition of autism and therefore failed to analyze the effects of this condition in the domains of functioning. Plaintiff also claims that the ALJ erred by his failure to properly consider the opinion of D.J.'s teacher, Mr. Bosch, and failed to identify the weight accorded to other opinion evidence. The undersigned will address each of plaintiff's contentions in turn.

A.   <u>Failing to Consider Autism</u>

In his written decision, the ALJ did not consider either autism or Asperger's syndrome to be a severe medically determinable impairment, finding there to be no medical evidence to support plaintiff's allegations that D.J. suffered from such an impairment.

- 31 -

There is no objective clinical diagnosis of
autism or Asperger's Syndrome in the record.
The closest the claimant comes to either
diagnosis is found in the lengthy report from
the speech pathologist wherein she states the
claimant demonstrated characteristics of each
condition. Much of the pathologist's findings
were based upon the report of the claimant's
mother. The speech pathologist is not a
doctor. Having characteristics of a condition
is not a clinically objective diagnosis of
that condition. Further, the claimant's most
recent individualized education program (IEP)
does not contain said diagnoses. The claimant
received speech therapy at Touch Point for a
brief period, but his mother discontinued
services. The Regulations provide that an
individual's subjective complaints are not
conclusive evidence of disability. There must
be medical signs and findings, established by
medically acceptable diagnostic techniques,
which show the existence of a medical
impairment that results from anatomical,
physiological, or psychological abnormalities,
which could reasonably be expected to produce
the pain or other symptoms alleged, and which,
when considered with all of the evidence,
would lead to a conclusion that the individual
is under a disability. There is no medical
evidence to support the claimant's allegations
of autism or Asperger's Syndrome.

(Tr. 18.) (Citation to record omitted.)

The ALJ thus found D.J.'s claimed autism not to be a medically
determinable severe impairment and therefore did not consider the
condition subsequent to Step 2 of the sequential evaluation
process. Because the ALJ's analysis in this regard is flawed and
incomplete, it cannot be said that the ALJ's determination is
supported by substantial evidence on the record as a whole.

To be considered disabled and eligible for SSI benefits, a child-claimant must have a medically determinable impairment that is severe. 20 C.F.R. §§ 416.906, 416.924(c). A "medically determinable impairment" must "result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques[,]" and must be "established by medical evidence consisting of signs, symptoms, and laboratory findings[.]" 20 C.F.R. § 416.908. Subjective reports of symptoms alone do not establish an impairment. Id.

In determining disability for children, the Commissioner must consider all relevant information in the record, including "information from medical sources, such as [the child's] pediatrician, other physician, psychologist, or qualified speech-language pathologist; other medical sources . . . , such as physical, occupational, and rehabilitation therapists; and nonmedical sources, such as . . . parents [and] teachers[.]" 20 C.F.R. § 416.924a(a). Medical sources will report their findings and observations from clinical examinations as well as the results of any formal testing. 20 C.F.R. § 416.924a(a)(1)(iii). "Whenever possible and appropriate, the interpretation of findings by the medical source *should reflect consideration of information from [the child's] parents* or other people who know [the child], including . . . teachers and therapists." Id. (emphasis added).

Medical evidence may also include opinions from medical sources about the nature and severity of a child's impairments. 20 C.F.R. § 416.924a(a)(1)(i).

In his written decision here, the ALJ determined to discredit the results of the August 2009 evaluation conducted by speech pathologist Lisa McNiff for the reasons that Ms. McNiff is not a medical doctor and that much of her findings were based upon the report of plaintiff, D.J.'s mother. While not a medical doctor, Ms. McNiff is nevertheless a medical source under § 416.924a(a) inasmuch as she is a qualified speech-language pathologist. As such, Ms. McNiff's reports, opinions, and findings from her clinical examination and formal testing are considered "medical evidence" under § 416.924a(a)(1). In addition, the Regulations instruct medical sources to include in their reports their consideration of information obtained from a child-claimant's parents. For the ALJ to discredit this medical source's report for her compliance with the Regulations was error. Nevertheless, a review of the evaluation conducted by Ms. McNiff shows that *in addition to* considering diagnostic scales completed by plaintiff, Ms. McNiff also administered an objective and standardized diagnostic test from which she independently measured D.J.'s responses and found his scores to place him within the autism range. Accordingly, contrary to the ALJ's assertion, Ms. McNiff's conclusions were not based solely on subjective complaints.

In addition, contrary to the ALJ's finding that there existed no objective clinical diagnosis of autism or Asperger's syndrome in the record, a review of the record in its entirety shows that beginning in May 2009 and continuing through September 2010, treating physicians from Grace Hill repeatedly and objectively diagnosed D.J. with PDD, that is, Pervasive Developmental Disorder, which is a type of autism spectrum disorder.[9] The ALJ wholly failed to address this diagnosis in his decision and indeed failed to address the evidence and information from which D.J.'s treating physicians made the diagnosis, including teacher-completed Social Responsiveness Scales and Vanderbilt Assessment Scales, parent reports, and personal observations upon examination.

Although evidence of classic autism is not definitive from this record, the record solidly establishes D.J.'s diagnosis of PDD which falls within the range of autism spectrum disorders. In light of the substantial medical evidence of D.J.'s diagnosed condition of PDD, the ALJ erred in failing to find PDD to be a medically determinable impairment. Notably, Listing 112.10 of the Listings of Impairments not only governs Autistic Disorder, but it governs Pervasive Developmental Disorders as well. Upon remand, therefore, the ALJ should consider Listing 112.10 in determining whether D.J.'s impairments – either singly or in combination –

---

[9] See n.5, supra.

meet, medically equal, or functionally equal a listed impairment.
See <u>Bauer v. Astrue</u>, 730 F. Supp. 2d 884, 895 (N.D. Ill. 2010).

B.   <u>Weight Given to Opinion Evidence</u>

        In evaluating opinion evidence, the Regulations require
the ALJ to explain in the decision the weight given to any opinions
from treating sources, non-treating sources, and non-examining
sources.   20 C.F.R. § 416.927(f)(2)(ii).   Findings made by State
agency medical or psychological consultants are considered opinion
evidence and, as such, the ALJ must explain in the decision the
weight accorded to such opinions.   20 C.F.R. § 416.927(f)(2)(i),
(ii).  In addition, when considering opinion evidence from a child-
claimant's teacher, the ALJ should explain the weight given to said
opinion "or otherwise ensure that the discussion of the evidence in
the . . . decision allows a claimant or subsequent reviewer to
follow the adjudicator's reasoning."   SSR 06-03p, 2006 WL 2329939,
at  *6  (S.S.A.  Aug.  9,  2006).   <u>See also</u>  20  C.F.R.  §
416.924a(a)(2)(iii)   (Commissioner   considers   all   relevant
information, including information from non-medical sources such as
teachers).

        1.   *State Agency Opinion Evidence*

        In  his  determination  that  D.J.'s  impairments  did  not
functionally equal a listed impairment, the ALJ acknowledged that
the record contained opinion evidence from State agency consultants
and that he considered such to be "expert opinions" on the issue of

D.J.'s capabilities and limitations. (Tr. 18.) Despite acknowledging these opinions, the ALJ failed to explain in his decision the weight he accorded them. Such failure was error.

In his written decision, the ALJ stated that he considered the State agency opinions which were rendered in June 2007, August 2008, and July 2009.[10] (Tr. 18.) Notably, such opinions were rendered prior to D.J. undergoing diagnostic testing for autism from which it was found that D.J.'s scores placed him within the range of autism spectrum disorder, and prior to D.J. consistently being diagnosed by his treating physician as having PDD. In addition, the most recent State agency opinion considered by the ALJ was rendered in July 2009, seventeen months prior to the administrative hearing in this cause. In circumstances where such a gap exists between the rendering of a "considered" State agency opinion and the administrative hearing, and during which time additional medical evidence was admitted into the record, an ALJ's failure to explain the weight given to State agency opinions gives rise to reversible error. See Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008). By explaining the weight given to State agency opinions, an ALJ both complies with the Regulations and assists the Court in reviewing the decision. Id. An ALJ's failure to do so, however, creates doubt as to whether the ALJ properly reviewed the evidence. Id. at 779–80.

---

[10]The ALJ did not acknowledge the State agency opinion rendered in March 2010.

When coupled with other errors in the decision, the ALJ's failure here to acknowledge all of the opinion evidence of record and failure to explain the weight accorded such opinion evidence creates sufficient doubt about his rationale for denying plaintiff's claim such that further proceedings are required. <u>Willcockson</u>, 540 F.3d at 779-80.

2. *Teacher Opinion Evidence*

In his decision, the ALJ determined to discredit the October 2010 teacher report completed by Mr. Bosch for the reasons that the report failed to indicate the length of the teaching relationship or the frequency of contact; the report was inconsistent with the March 2010 IEP and Ms. Hochstatter's June 2009 teacher report; the record was unclear as to whether D.J. was taking his medication at the time the report was completed; and Mr. Bosch was not an acceptable medical source. The ALJ instead determined to rely on the June 2007 consultative examination conducted by psychologist Dr. Mades. (Tr. 18.) In the circumstances of this case, such reasons constitute an insufficient basis upon which to discredit Mr. Bosch's teacher report.

As an initial matter, the fact that Mr. Bosch is not a medical source is irrelevant to determining what weight to accord his opinion. As noted <u>supra</u>, in determining disability for children, the Commissioner must consider <u>all</u> relevant information in the record, including information from non-medical sources such

as parents and teachers. 20 C.F.R. § 416.924a(a). Indeed, Social Security Ruling (SSR) 06-3p considers teachers to be "valuable sources of evidence for assessing impairment severity and functioning" inasmuch as they often "have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time." SSR 06-03p, 2006 WL 2329939, at *3 (S.S.A. Aug. 9, 2006). As such, to discount opinion evidence from a teacher because the teacher is not a "medical source" is contrary to the Regulations and constitutes error. In addition, the ALJ's crediting of a June 2007 consultative evaluation over an October 2010 teacher evaluation raises questions as to whether the ALJ adequately determined D.J.'s functional limitations as they existed at the time of the hearing. Cf. Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995) (error to rely on remote medical evidence to determine RFC; RFC must reflect claimant's functional abilities at time of hearing); Morse v. Shalala, 32 F.3d 1228, 1230-31 (8th Cir. 1994) (ALJ erred by relying on old medical report and giving no weight to subsequent supporting evidence).

To the extent the ALJ discredited Mr. Bosch's report on account of the report's silence as to the length of the teacher relationship and the frequency of contact, the undersigned notes that SSR 06-03p permits the Commissioner to consider these factors in determining what weight to accord this opinion evidence. SSR

06-03p, 2006 WL 2329939, at *5. However, when reviewed as a whole, the record shows Mr. Bosch to have been D.J.'s teacher from August to October 2010 (Tr. 41-42, plaintiff's testimony). No contrary evidence appears in the record. Substantial evidence does not support the ALJ's determination to discredit Mr. Bosch's report on account of a purported lack of information relating to Mr. Bosch's relationship with D.J.

Likewise, to the extent the ALJ discredits Mr. Bosch's report given its inconsistency with Ms. Hochstatter's June 2009 teacher report, the undersigned notes that the ALJ wholly fails in his decision to acknowledge the NICHQ Vanderbilt Assessment Scale completed in March 2009 by Ms. Hochstatter wherein Ms. Hochstatter reports behavior strikingly consistent with that reported by Mr. Bosch.[11] In addition, in his October 2010 report, Mr. Bosch provides written explanations supporting his opinions, whereas Ms. Hochstatter's June 2009 checklist report is silent in this regard. The degree to which a teacher presents relevant evidence to support his opinion, and whether such opinion is consistent with other evidence, are factors to be considered in determining what weight to accord the teacher's opinion. SSR 06-03p, 2006 WL 2329939, at *5. Other than cursorily stating that Mr. Bosch's opinion is inconsistent with other evidence, the ALJ fails to articulate the

_____

[11]Notably, in the Vanderbilt Scales completed in March 2009, Ms. Hochstatter reported that D.J. engaged in the various described behaviors while on medication. (<u>See</u> Tr. 562.)

bases for such perceived inconsistency and indeed ignores consistent relevant evidence of record.

Finally, plaintiff claims that the ALJ erred by failing to explain the weight accorded to Ms. Hochstatter's June 2009 teacher report. Social Security Ruling 06-03p counsels that, in his decision, the ALJ should explain the weight given to teachers' opinions, "or otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." SSR 06-03p, 2006 WL 2329939, at *6. A review of the ALJ's decision *in toto* shows the ALJ to have relied heavily on Ms. Hochstatter's June 2009 report in determining D.J.'s impairments not to functionally equal a listed impairment. In five of the six domains of functioning, the ALJ referred to various entries in Ms. Hochstatter's report to support his conclusions regarding D.J.'s functional abilities therein. (See Tr. 19-23.) As such, while not specifically identifying the weight accorded to this June 2009 report, the tenor of the ALJ's discussion of the report nevertheless allows the Court to follow his reasoning. Accordingly, it cannot be said that the ALJ erred merely by failing to identify the specific weight accorded to Ms. Hochstatter's June 2009 report. Noticeably lacking, however, is any reasoning as to why this report was given greater credence over any other teacher report in the record. Upon remand, when considering opinion evidence obtained from teachers, the ALJ should

discuss the factors set out in SSR 96-03p and weigh such opinion evidence in accordance thereto.[12]

## VI.  Conclusion

For all of the foregoing reasons, the Commissioner's determination that D.J. was not under a disability is not supported by substantial evidence on the record as a whole.  Upon remand, the ALJ must consider D.J.'s medically determinable impairment of Pervasive Developmental Disorder and consider such impairment in combination with D.J.'s other severe medically determinable impairments in determining whether D.J.'s impairments functionally equal a listed impairment, including Listing 112.10.  In addition, in determining functional equivalence, the ALJ must consider all the relevant evidence of record relating to D.J.'s impairments, including evidence from medical sources, non-medical sources, and other sources such as teachers and parents, and identify and accord appropriate weight to the opinion evidence of record.

_____

[12]When considering opinion evidence from a teacher, SSR 06-03p instructs the Commissioner to consider such factors as

> the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion.

SSR 06-03p, 2006 WL 2329939, at *5.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Acting Commissioner of Social Security Carolyn W. Colvin be substituted for former Commissioner Michael J. Astrue as defendant in this cause.

**IT IS FURTHER RECOMMENDED** that the decision of the Commissioner be reversed and the cause be remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **June 25, 2013.** Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_

UNITED STATES MAGISTRATE JUDGE

Dated this _11th_ day of June, 2013.